BRUCE and JOANNE BROWN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown v. Commissioner
Docket No. 15981-84.
United States Tax Court
T.C. Memo 1986-239; 1986 Tax Ct. Memo LEXIS 369; 51 T.C.M. (CCH) 1171; T.C.M. (RIA) 86239; June 12, 1986. Towner S. Leeper and David Leeper, for the petitioners. David W. Johnson, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: Respondent *373 determined a deficiency in petitioners' Federal income tax in the amount of $194,326, and an addition to tax under section 6653(b) [1] against petitioner Bruce Brown in the amount of $98,424 for the taxable year ended December 31, 1978. The issues presented for decision are: (1) Whether the period of assessment of the tax due for petitioners' taxable year ended December 31, 1978, expired prior to May 15, 1984, the date on which respondent issued the notice of deficiency; (2) whether petitioners are entitled to a claimed casualty loss in the amount of $364,900; (3) whether petitioners are entitled to an interest expense deduction in the amount of $15,000; (4) whether petitioners are entitled to a depreciation deduction in the amount of $13,496; (5) whether petitioners are entitled to an investment tax credit in the amount of $9,097, including a claimed investment tax credit carryback from 1979 to 1978 in the amount of $4,405; and (6) whether respondent has established by *374 clear and convincing evidence that any underpayment of income tax was due to petitioner Bruce Brown's fraud with intent to evade tax under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulations of fact, and exhibits attached thereto are incorporated herein by this reference. Bruce Brown ("Bruce" or "petitioner") and Joanne Brown ("Joanne") were husband and wife and residents of El Paso, Texas at the time the petition herein was filed. Bruce and Joanne filed a joint Federal income tax return for their taxable year ended December 31, 1978. The 1978 return was received by the Internal Revenue Service Center in Austin, Texas, on May 21, 1979. I Petitioner was born on a farm in Alabama. He had been involved in the custom brokerage business since 1954. He owned all the stock of Brown's Refrigerated Warehouse, Inc., a public refrigerated warehouse located in El Paso, Texas. Petitioner also imported Mexican cattle, invested in feedlot operations, and operated a meat-packing plant and a food-processing company.Petitioner had no experience, however, in cattle ranching. The A Bar A Ranch, *375 subsequently known as the Cinco B Ranch, comprised approximately 1,166 acres of land located in Bandera County, Texas. In 1978, approximately 640 acres ("the 640-acre tract") were owned by the Estate of Isabel M. Anderson; her son, E. M. Anderson, Jr. ("Anderson"), owned approximately 526 acres ("the 526-acre tract") [2]. Anderson was the executor of his mother's estate. By letter dated June 19, 1978, Bruce apprised his attorney, Bates Belk, that he was planning to acquire the above-mentioned tracts. Bruce wanted to exchange the 526-acre tract for other property in a tax-free transaction, if possible. The 640-acre tract was to be acquired by the PBJ Trust (see infra). Petitioner stated in his letter that "Neither transaction will take place without the other," and that if the tax-free exchange was not feasible he would still try and buy the property. The Estate of Isabel M. Anderson sold the 640-acre tract to Calvin Wallace for $284,000 and, on June 30, 1978, Wallace sold the said 640-acre tract to the PBJ Trust for $384,600. The PBJ Trust was *376 created on September 1, 1977, pursuant to the terms of a trust agreement executed by petitioners. Bruce was the trustee and petitioners' children were the beneficiaries of the PBJ Trust. By letter dated June 14, 1978, from Bruce to Anderson, Bruce requested a lease with an option to purchase the 526-acre tract ("lease-option agreement"). The said proposed agreement provided as follows, in pertinent part: I am very interested in purchasing your property, but at this time I would prefer to lease all of the same with an option to purchase it. Considering the usefulness of the improvements and fixtures, and the value of the land and the location for both agricultural and other uses, the following offer to lease is made. Lease
For a solid two (2) years, beginning on the date when you accept this entire offer (and which offer shall be void if not accepted by the close of business on June 30th, 1978) I will pay to you the sum of TEN THOUSAND & NO/100 ($10,000.00) DOLLARS per year as lease or rent for the land and improvements. That is, I obligate myself to pay you $20,000.00 for the 2-year period, payable $5,000.00 now, and $5,000.00 semiannually thereafter until all of the *377 rent is paid. In addition I will pay for insurance on all buildings, and maintain $100,000/$300,000 liability coverage at my expense. While I will require immediate right to possession of the premises (I will want to move my horses in, have employees resident on the premises and have exclusive right to otherwise use and occupy the premises and improvements) you may be assured that if I don't keep the improvements up, or if I over-graze the land, destroy growing timber, alter any improvements or otherwise permit deterioration or waste of the premises without your written consent, you can kick me off by all lawful means. You will have the right to inspect at all reasonable times. Option
During the period that I keep the terms of my lease, I will also have the exclusive option to purchase the real estate and improvements for the sum of SEVEN HUNDRED FIFTY THOUSAND & NO/100 ($750,000.00) DOLLARS, payable as later set forth. For this option I will pay you $65,000.00, $32,500.00 now, and $32,500.00 on or before December 30, 1978, with the understanding that if I don't make the December option payment, I will lose the option and the money I have paid on it. On the other hand, *378 I will have the right to exercise the option at any time, so I may decide to do this on or before the second payment date. If so, I will deposit $32,500.00 with the title company you select as earnest money; and this option will then become a contract of sale performable within sixty days after I exercise the option. Of course, I will continue in possession under the above lease and continue to pay rent up to the date of closing. Also when the deal is closed the money I have paid for the option (or deposited as earnest money) will be credited on the cash part of the purchase price. So long as the option exists as an option, time is of the essence, and my failure to perform will result in loss of all money paid for the option. In order to exercise the option, I will be required to give you sixty days notice by certified or registered mail, return receipt requested at the address which you show below your name. You will then have that period of time to execute and deliver to me a deed with general covenants of warranty conveying fee simple title to said land subject only to utilities easements and liens for the unpaid part of the purchase price. At the time when you deliver the *379 deed you will also obtain for my benefit a guaranty title for $750,000.00 containing no exceptions other than those printed in the form and those permitted in the deed. In such case the closing may be earlier than sixty (60) days and at any time after you have given my [sic] ten (10) days written notice by registered or certified mail at my address shown below. At closing I will deliver the balance of the down payment, my promissory note for the deferred part of the purchase price, and my deed of trust additionally securing its payment. The total down payment is $150,000/00, and my note will be for the balance, bearing interest at 9.25%, payable in ten (10) consecutive equal annual installments of principal plus accrued interest beginning one year after the date of closing. Said note shall provide for 10% interest on matured and unpaid items, for acceleration of maturity upon default of any installment, and for reasonable attorney's fees if placed in the hands of an attorney for collection after maturity, or if collected through any court proceedings. * * * Tendered herewith is my check for $37,500.00, $5,000.00 being the first rental payment and $32,500.00 the first *380 option payment. If you find this acceptable, please sign in the space provided below, and attach a correct legal description. If you desire to place a value on your house and 3 to 4 acres, please do so and that will not be regarded by me as a change in the agreement. However, this offer must be accepted not later than the 30th of June, 1978. Petitioner tendered his check dated June 26, 1978, in the amount of $37,500, to Anderson with the lease-option agreement. The check was drawn on Bruce's account at the Bank of El Paso and was payable to Darrell Lochte, Escrow. A notation on the check indicated that the payment was made for "581 [sic] Acres, A-Bar-A, 6 Months Lease Purchase." Darrell Lochte was Anderson's attorney. By letter dated June 30, 1978, Anderson accepted petitioner's lease-option proposal. Anderson further stated that should Bruce find an opportunity to use the 526-acre tract in a tax-free exchange, he would agree to a cancellation of the lease-option agreement, "provided only that I receive the same amount of money on the same terms which I would receive under your offer if it were fully performed." Enclosed with the letter was the lease-option agreement, signed *381 by Anderson. In accordance with its provisions, Anderson attached a correct legal description of the property to the agreement. Bruce's check, dated June 26, 1978, in the amount of $37,500 was deposited into Lochte's escrow account at the First National Bank of Kerrville on July 5, 1978. On July 12, 1978, Lochte wrote a check, in the amount of $37,500, payable to Anderson. The recited purpose on the check was "Bruce W. Brown Lease-Option Agreement." The said check was deposited into Anderson's account at the Schreiner Bank in Kerrville on July 13, 1978. The Andersons did not move out of the A Bar A Ranch until the later part of July 1978. John Mantigold, Bruce's employee, moved to the ranch soon afterwards. Mantigold was Bruce's only permanent employee working on the ranch in 1978. Petitioners did not reside on the ranch in 1978; they resided in El Paso. Don, Anderson's son, lived in one of the houses located on the 526-acre tract. He paid $150 a month to Bruce in 1978 as rent, plus utilities. Between August 1 and 3, 1978, the Medina River, which flowed adjacent to the 526-acre tract, flooded, reaching a crest of 45 feet. The flood resulted from 20 to 30 inches of rain *382 falling on the area in the period. On September 25, 1978, petitioner applied for a Small Business Administration ("SBA") loan, in the amount of $735,000, for the purpose of repairing the damage caused to the A Bar A Ranch by the flooding of the Medina River. The SBA loss verifier, J. R. Fisher, found Bruce's estimate of damages unrealistic. He concluded that there was no damage to the dwellings on the premises or to the aircraft hangar, but that there was a heavy loss of trees along the river bank and heavy debris accumulation. The SBA approved a loan to petitioners, in the amount of $147,800, on November 14, 1978. Anderson acquired two insurance policies through Louis D. Chandler, an employee of Medina Insurance Agency, with respect to the A Bar A Ranch for the period between June 21, 1978, and June 21, 1979. The policies were not canceled prior to their termination date. Anderson did not carry flood insurance on the 526-acre tract during 1978. In the fall of 1978, petitioner contacted Arlington Helbing and commissioned him to prepare an appraisal estimating the loss in the value of the 526-acre tract, and of the 640-acre tract owned by the PBJ Trust, caused by the flood *383 of August 1978. Helbing delivered his report to petitioner on May 3, 1979, indicating curable and incurable damage to the 526-acre tract of $348,000 and to the 640-acre tract of $17,000, for a total of $365,000. Bruce never exercised the option as set forth in the lease-option agreement by giving 60-days notice to Anderson by certified or registered mail, or otherwise. Bruce directed Belk, in November 1978, to prepare a draft of an option agreement ("the November 1978 option") to supersede the lease-option agreement accepted by Anderson on June 30, 1978. Belk prepared the option agreement as per Bruce's instructions. [3] Anderson and Lochte discussed the provisions of the November 1978 option in November 1978, but it was not executed. *384 On December 22, 1978, petitioner purchased a cashier's check from the Bank of El Paso, in the amount of $77,500, payable to Anderson. A meeting was held on December 26, 19788 in Lochte's office between Bruce, Anderson, and Lochte.Lochte took notes of what transpired at the said meeting, which notes were signed by Bruce and Anderson. The notes set forth modifications to the terms of the lease-option agreement, as follows: (1) the down payment was to be $100,000; (2) the $650,000 balance was to be paid with a note bearing interest at an annual rate of 9.25 percent commencing on July 1, 1979; (3) the first payment, consisting of 6 months of interest, was due on January 1, 1980; and (4) principal and interest were to be paid in 30 semiannual installments, beginning on July 1, 1980. The check in the amount of $77,500 was delivered to Anderson; $67,500 of this amount was credited to the down payment. The closing of the sale of the 526-acre tract occurred on February 6, 1979. The transaction could not be closed until February 6, 1979, because Bruce and Anderson did not reach a final agreement with respect to the terms of the sale until December 26, 1978, and not because of the tardiness *385 of Lochte and/or Belk in preparing the necessary documents. The closing statement prepared by Lochte provided, in part, as follows: [4]
CLOSING STATEMENT
Date - Feb. 6, 1979 * E. M. Anderson, Jr. et ux to Bruce W. Brown, et ux 532 acres, various surveys, Bandera County
Total Sales Price
$750,000
Insurance Proration
Gross Amount Due
$750,000
Less Deductions: Purchase money note
650,000
Tax proration
Balance due ** $100,000
Lochte prepared a Warranty Deed with Vendor's Lien, pursuant to the terms of which the Andersons conveyed the 526-acre tract to petitioners. The warranty deed was executed by the Andersons on February 6, 1979, but was back-dated so as to appear that it had been signed on July 1, 1978. Lochte wrote petitioners on February 6, 1979, sending them, inter alia, a copy of the executed warranty deed, an *386 original deed of trust to be executed by petitioners, and an original and a copy of a promissory note to be signed by petitioners. The above-mentioned promissory note, dated July 1, 1978, was thereafter signed by petitioners. The note provided that the principal ($650,000) and interest, from July 1, 1979, at the annual rate of 9.25 percent, were payable as follows: (1) one installment, due on January 1, 1980, of interest only; and (2) 30 semiannual installments, in the amount of $40,493.35, representing principal and interest, payable on the first day of each July and January thereafter until all the principal and interest were paid, except that the last payment, due on January 1, 1995, was to be for $40,492.85. Petitioners executed the deed of trust that was enclosed with Lochte's letter with respect to the 526-acre tract in order to further secure the payment of the $650,000 promissory note. The deed of trust was signed on September 24, 1979, and was filed with the clerk of the County Court of Bandera County, Texas, on March 14, 1980. Anderson and his wife reported gain from the sale of the 526-acre tract to petitioners on their 1979 joint income tax return. Bruce insured *387 the A Bar A Ranch effective March 1, 1979, with John D. Williams Co. in El Paso, Texas. The title policy with respect to the conveyance of the 526-acre tract by the Andersons to petitioners was issued on March 14, 1980. Bruce did not have legal or equitable title to the 526-acre tract as of August 3, 1978. Gene Henderson, petitioners' accountant, prepared their joint income tax return for 1978 based on information provided to him by Bruce and his employees. Henderson was not provided with copies of the lease-option agreement; Anderson's acceptance of the lease-option agreement; the November 1978 option; Lochte's notes dated December 26, 1978, signed by Bruce and Anderson; the warranty deed with vendor's lien; or the deed of trust; nor was Henderson aware of the existence of the aforesaid documents when he prepared petitioners' 1978 return. Henderson was provided, however, with the information contained in the closing statement dated February 6, 1979, and the appraisal report prepared by Helbing. Petitioners claimed a casualty loss on Schedule A of their 1978 return, with respect to flood damage at the ranch (both tracts), as a personal casualty loss under section 165(c)(3), *388 as follows: Loss before insurance reimbursement
$365,000
Insurance reimbursement
Statutory limitation
100
Casualty loss deduction claimed
$364,900
Respondent disallowed the claimed casualty loss in his statutory notice of deficiency with the following explanation: It is determined that the casualty loss of $364,900.00 claimed on your return for the taxable year ended December 31, 1978 resulting from severe flooding on 532 acres of land along the Medina River is not allowable because you failed to show that you owned or had legal title to the acrage [sic] on or before the date of the flood or that any loss was incurred during 1978. Accordingly, your taxable income is increased in the amount of $364,900.00. II Petitioners claimed no entitlement to an interest deduction with respect to the purchase of the 526-acre tract on their return for the taxable year ended December 31, 1978, but such claim was made, for $15,000, in the first amendment to the petition filed on March 26, 1985. Petitioners made the first payment of interest with respect to the $650,000 promissory note on January 7, 1980. The payment was in the amount of $30,062.50; no amount of the *389 said payment was credited to principal, and the balance due on the note remained $650.000. III. Mantigold was petitioner's only permanent employee residing on the Ranch in 1978. It was not until 1979 that additional permanent employees were hired by petitioner. Bruce did not purchase any cattle for the ranch until September 1979, when he purchased 35 head of cattle. The maximum number of cattle on the ranch between September 1979 and the year 1982 was approximately seventy-five. The combined carrying capacity of the 526-acre tract and the 640-acre tract owned by the PBJ Trust was 80 animal units -- either horses, cows, bulls, or sheep -- assuming that supplemental feed and hay were provided. Petitioners did not make any expense-profit projection in order to ascertain what was the minimum number of cattle that had to be grazed on the ranch in order to obtain a profit. No Schedule F, Farm Income and Expenses, was attached to petitioners' return for the year 1978 and no income or expenses from ranching activities were reported on the said return. Schedule F was attached to petitioners' returns for the years 1979 through 1982, inclusive. In the said Schedule F attached to *390 the returns petitioners reported income and expenses as follows: 1979
1980
1981
1982
Total
Income
$ 7,913 $ 9,984 $ 78,929 $ 50,118 $ 146,944 Expenses
194,970 353,815 554,072 397,211 1,500,068 Net Profit
or (Loss)
($187,057)
($343,831)
($475,143)
($347,093)
($1,353,124)
Petitioners did not report a profit from the ranching activities on their returns for the years 1983 and 1984. In 1979, petitioners built a house costing approximately $450,000 on the ranch, and remodeled the swimming pool and built a tennis court at a cost of approximately $26,000 and $8,000, respectively. One of the dwellings on the farm was remodeled, at a cost of approximately $3,000, in order to convert it into an art studio for Joanne. Five other houses on the ranch were remodeled, an aircraft hangar was rebuilt, and underground fuel tanks were purchased and installed at a cost of approximately $214,000, $53,000, and $29,549.50, respectively. An irrigation system on the land was not installed. Electric fences were not installed, brush was not cleared, and hay was not planted until 1979. Petitioners did not claim a depreciation *391 deduction nor an investment tax credit with respect to property located at the 526-acre tract on their 1978 return, but such claims were made, in the respective amounts of $13,496 and $9,097, [5] in the first amendment to the petition filed on March 26, 1985. Petitioners had previously filed Form 1045, Application for Tentative, Refund, in which they claimed an unused investment tax credit carryback from 1979 to 1978 in the amount of $4,405, with respondent. Respondent disallowed the claimed carryback in his notice of deficiency for 1978 with the following explanation: It is determined that the deficiency herein constitutes a recover [sic] of a tentative allowance in the amount of $4,405.00 made on September 15, 1980 as a result of Form 1045 being filed to carry back an unused investment tax credit for the taxable year ended December 31, 1979. As part of a separate notice of deficiency to petitioners for the years 1976, 1977, and 1979 through 1982, respondent determined that petitioners' allowable investment tax credit for 1979 was $11. IV Petitioners' return for their taxable *392 year 1978 was selected for audit. Edwin Kurek, an engineer employed by the Internal Revenue Service in Texas, was assigned to petitioners' case and asked to determine whether the amount of the casualty loss claimed by petitioners on their return should be allowed in its entirety. For that purpose, Kurek visited the A Bar A Ranch on January 26, 1982, when he toured the ranch with Bruce and had an opportunity to review the damage done as a result of the flood of the Medina River in August 1978 and the repairs that had been made. Thereafter, Bruce was interviewed by Kurek and by Richard Schampers, an IRS agent, on June 14, 1983 and again on October 19, 1983. During the course of the examination of petitioners' 1978 return, Bruce was asked on several occasions whether he had leased the 526-acre tract. On each and every occasion and at trial, petitioner denied having leased the 526-acre tract. On October 5, 1983, Kurek visited Lochte's law office where he learned of the existence of the June 1978 lease-option agreement. Subsequently, on February 6, 1984, Kurek was able to obtain an unexecuted copy of the lease-option agreement from Lochte pursuant to an administrative summons. *393 On October 5, 1983, Kurek inspected the county deed records and obtained copies of the warranty deed and the deed of trust. Kurek phoned Anderson on October 17, 1983, and inquired about the particulars of the sale of the 526-acre tract to Bruce. Anderson said that he did not have a clear recollection of the events but that he would try and find his records in order to be able to answer Kurek's questions. Kurek called Anderson back on October 18, 1983, and described to him the lease-option agreement. Anderson admitted that he did a copy of the said agreement but stated that it was not executed. On October 19, 1983, Kurek met with Henderson and Bruce in Henderson's office. Kurek requested that Bruce bring his records and any other documents related to the purchase of the 526-acre tract. Bruce brought: (1) Anderson's letter, dated June 30, 1978, accepting the lease-option agreement; (2) Bruce's check dated June 28, 1978, in the amount of $37,500, payable to the order of Anderson; (3) the cashier's check from the Bank of El Paso, in the amount of $77,500, payable to Anderson; (4) the unexecuted November 30, 1978 option; and (5) the $650,000 promissory note dated July 1, 1978. With *394 respect to the option dated November 30, 1978, Bruce told Kurek that he did not know why it was drafted and that the option was not his idea. Bruce did not tell Kurek that the $650,000 promissory note was not prepared or executed until February 1979, nor did he furnish Kurek with copies of the December 26, 1978 agreement -- which altered the terms of the lease-option agreement -- the warranty deed, the deed of trust, or the notes taken by Lochte at the December 26, 1978 meeting that were signed by Anderson and petitioner. Bruce showed a copy of the $650,000 promissory note dated July 1, 1978, as evidence that he had purchased the 526-acre tract and represented to Kurek that that was the date on which he had given the note to Anderson. Petitioner never represented to Kurek that the "purchase" of the 526-acre tract took place on July 13, 1978, nor did he represent that he was the equitable owner of the said property. Kurek described the lease-option agreement and inquired whether petitioner had leased the property before purchasing it. Bruce answered that he had not leased the property and it had never been his intention to lease the property. On February 6, 1984, Anderson was *395 interviewed by Larry Zunker, respondent's special agent, and by Kurek. The interview was conducted in Lochte's office and in his presence and the proceedings were recorded and transcribed. Anderson made numerous representations to respondent's agents including the following: (1) that the $650,000 promissory note was dated July 1, 1978, by Lochte and was signed by petitioners on that date and in the presence of the Andersons; (2) that the promissory note provided that interest would accrue from July 1, 1979, but that the first interest payment was due on January 1, 1980, as a "perk" or incentive to Bruce who wanted additional time in order to raise money from the sale of certain business interests; (3) that he did not have a copy and did not execute the lease-option agreement; and (4) that he sold other items to Bruce including a hunting buggy and a pick-up truck. Anderson also provided respondent's agents with copies of the following documents: (1) the November 1978 option; (2) a stamped slip dated July 13, 1978, acknowledging that the amount of $37,500 had been deposited to Anderson's checking account at the Schreiner Bank in Kerrville; (3) a customer note ledger from the Schreiner *396 Bank stating, inter alia, that on January 7, 1980, petitioner paid $30,062.50 on the $650,000 promissory note, which amount was interest, and that after crediting the said payment the balance due on the said note remained $650,000; (4) a copy of a deposit slip to the above-mentioned checking account for $77,500 dated January 2, 1979; (5) a copy of the $650,000 promissory note; (6) a copy of the closing statement dated February 6, 1979; (7) a copy of the lease-option agreement; and (8) a copy of Anderson's acceptance letter dated June 30, 1978. V On November 18, 1981, petitioners signed Form 872, Consent to Extend the Time to Assess Tax, and thereby agreed to extend the period of assessment of tax for the year 1978 until December 31, 1982. Henderson signed the consent as petitioners' representative. The consent was executed by respondent on November 26, 1981. The period of assessment of the tax due for the year 1978 was further extended until December 31, 1983, by a Form 872 executed by petitioners on July 30, 1982, and by respondent on August 2, 1982. This second Form 872 was also signed by Henderson as petitioners' representative. A Form 872-A, Special Consent to Extend *397 the Time to Assess Tax, was executed by petitioners on October 30, 1983, and was accepted on behalf of respondent on November 14, 1983. The special consent provided, in pertinent part, as follows: (1) The amount(s) of any Federal Income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended December 31, 1978, December 31, 1979, and December 31, 1980 may be assessed on or before the 90th (ninetieth) day after: (a) the Internal Revenue Service office considering the case receives Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s); or (b) the Internal Revenue Service mails Form 872-T to the taxpayer(s); or (c) the Internal Revenue Service mails a notice of deficiency for such period(s); except that if a notice of deficiency is sent to the taxpayer(s), the time for assessing the tax for the period(s) stated in the notice of deficiency will end 60 days after the period during which the making of an assessment was prohibited. * * * Petitioners executed a Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, on February 13, 1984. The notice of termination *398 was signed by Bruce and by Henderson. On February 13, 1984, Henderson mailed the Form 872-T by certified mail, addressed to the "Internal Revenue Service Center, Austin, Texas 73301, Attention: Chief, Examination Division." The Form 872-T was received by the Internal Revenue Service Center in Austin, Texas, on February 17, 1984. The office considering petitioners' case was the Internal Revenue Service office in El Paso, Texas. On May 15, 1984 -- 92 days after petitioners' accountant mailed the Form 872-T and 88 days after the said form was received by the Internal Revenue Center in Austin, Texas -- respondent mailed to petitioners a notice of deficiency for 1978, determining the deficiency and addition to tax in issue. OPINION Issue 1. Statute of Limitations
Petitioners argue that the notice of deficiency herein was untimely because it was issued 92 days after Henderson mailed the executed Form 872-T to respondent. Petitioners' argument is meritless and must be rejected. Section 6501(a) provides the general rule that a deficiency in income tax shall be assessed within three years after the return is filed. An exception to this general rule is found in section 6501(c)(4), *399 which provides as follows: (4) Extension by agreement.--Where before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. A consent to extend the period of assessment of an income tax is essentially a unilateral waiver of a defense by a taxpayer and is not a contract. Grunwald v. Commissioner,86 T.C. 85 (1986); Piarulle v. Commissioner,80 T.C. 1035 (1983); Tallal v. Commissioner,77 T.C. 1291 (1981). Contract principles are significant, however, because section 6501(c)(4) requires that the parties reach a written agreement as to the extension. Grunwald v. Commissioner,supra;Piarulle v. Commissioner,supra.
The Form 872-A executed by petitioners and accepted on *400 behalf of respondent provided, in pertinent part, that the amount of any Federal income tax due for the period ended December 31, 1978 "may be assessed on or before the 90th (ninetieth) day after: (a) the Internal Revenue Service office considering the case receives Form 872-T, Notice of Termination of Special consent to Extend the Time to Assess Tax, from the taxpayer(s) * * *." (Emphasis added.) These are the terms of the agreement to which petitioners consented; there is no evidence that they tried to negotiate any different ones. Notwithstanding the fact that the Form 872-T was signed on February 13, 1984, it was not mailed by petitioners' accountant to the Internal Revenue Service office in El Paso, Texas -- which was known by him to be the office considering petitioners' case -- but to the Internal Revenue Service Center in Austin, Texas. Respondent issued the notice of deficiency herein 88 days after the receipt of the Form 872-T in Austin, on May 15, 1984. [6] Respondent has thus more than fully complied with the provisions of the agreement between the parties. Respondent's determinations are not barred by the statute of limitations. *401 Issue 2.Casualty Loss
Before addressing the remaining substantive matters presented by this case, we deem it proper to make some observations. First, the testimony of the witnesses in this case is plagued with inconsistencies that have made the fact-finding process unduly burdensome. Second, the demeanor and our view of the credibility of the witnesses, including petitioner, have played an important part in our determinations. Section 165(a) allows as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. In the case of an individual, the allowability of a deduction is limited by section 165(c) to: (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft, to the extent that the amount of each of the said losses exceeds $100. It is black letter law that the loss must be sustained by the taxpayer who seeks to deduct it. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); *402 Helvering v. Gordon,134 F.2d 685 (4th Cir. 1943); Glasgow Village Development Corp. v. Commissioner,36 T.C. 691 (1961); Rule 142(a). [7]
Petitioners claimed a casualty loss deduction in connection with the flooding of the Medina River between August 1 and 3, 1978, in the amount of $364,900 (after subtraction of the $100 statutory limitation) on line 29 of Schedule A attached to their 1978 return. [8] Respondent disallowed the claimed casualty loss in his statutory notice of deficiency, on the grounds that petitioners did not own nor have legal title to the 526-acre tract on or before the date of the flood. *403 In their petition filed on May 23, 1984, petitioners alleged that respondent had erred in determining that they were not entitled to the claimed casualty loss. In their second amendment to the petition filed on May 6, 1985, petitioners alleged that they had "acquired equitable title to the Cinco 'B' Ranch on or about June 30, 1978." At trial and on brief, petitioners argued that they assumed the benefits and burdens of ownership of the ranch in July 1978. A portion of the $365,000 claimed casualty loss -- before subtraction of the $100 statutory limitation in section 165(c)(3) -- is attributable to damages to the 640-acre tract ($17,000). As the parties stipulated, and as we have found, the 640-acre tract was sold by Wallace to the PBJ Trust, of which Bruce was the trustee, on June 30 1978. Petitioners do not contend, and the record does not show, that the PBJ Trust was a sham whose separate existence as a taxpayer must be disregarded. Therefore, this portion of the claimed casualty loss deduction must be disallowed since petitioners have failed to prove that they sustained the said loss. Petitioners argue that: (1) Bruce was trying to arrange a tax-free exchange with Anderson *404 pursuant to which Bruce was to acquire the 526-acre tract in exchange for Brown's Refrigerated Warehouse; (2) in the first part of July 1978, Anderson and his son, Don, traveled to El Paso to look at the refrigerated warehouse and decided that they were not interested in exchanging; (3) after Anderson notified him that he would not exchange the 526-acre tract for his property, Bruce told Anderson that he would purchase the 526-acre tract; (4) Anderson said that the $37,500 check that Bruce had given Lochte "would serve;" (5) Lochte released the $37,500 to Anderson after he was apprised of the above-mentioned events; and (6) the said events constituted an oral exercise of the option granted to Bruce -- pursuant to the terms of the lease-option agreement -- that invested petitioner with equitable title to the 526-acre tract and enabled him to claim the loss here in issue. The term "sale" is given its ordinary meaning for income tax purposes. A "sale" is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563 (1965). Generally, a sale of real property is complete upon the earlier of the transfer of legal *405 title or the assumption of the benefits and burdens of ownership. Derr v. Commissioner,77 T.C. 708 (1981); Baird v. Commissioner,68 T.C. 115 (1977). The lease-option agreement dated June 14, 1978, was signed and its terms accepted by Anderson on June 30, 1978. Pursuant to the terms of the said agreement, Bruce was to lease the 526-acre tract for a 2-year period. Bruce was to pay $10,000 per year as rent, payable $5,000 immediately and $5,000 semiannually thereafter. During the 2-year period of the lease, Bruce had the exclusive option to purchase the leased property and improvements thereon for $750,000. Petitioner was to pay $65,000 for the option, $32,500 immediately and $32,500 on or before December 30, 1978. Should Bruce not make the December option payment, he would lose the option and the initial $32,500 payment. A lease is a transfer of an interest in and possession of property for a prescribed period of time in exchange for an agreed consideration called rent. State National Bank of El Paso v. United States,509 F.2d 832 (5th Cir. 1975). In distinguishing between a contract of sale and an option, the inquiry must *406 be whether one party is obligated to sell and the other to purchase, or whether there is conferred a right to purchase if there is an election to do so. Redwine v. Hudman,104 Tex. 21, 133 S.W. 426 (1911); White v. Miller,518 S.W.2d 383 (Tex. Civ. App. 1974). A contract for sale of real estate is an agreement which binds the purchaser to buy and the seller to sell in accordance with the terms of the contract. Lefevere v. Sears,629 S.W.2d 768 (Tex. Ct. App. 1981); Tabor v. Ragle,526 S.W.2d 670 (Tex. Civ. App. 1975). The purpose of a purchase option is to give the optionee the right to purchase at his election within an agreed period at a named price. Sinclair Refining Co. v. Allbritton,147 Tex. 468, 218 S.W.2d 185 (1949). An option passes no title but prescribes conditions upon the occurrence of which an optionee may become entitled to demand passage of title. Click v. Seale,519 S.W.2d 913 (Tex. Civ. App. 1975); Lusher v. First National Bank of Fort Worth,260 S.W.2d 621 (Tex. Civ. App. 1953). Petitioner had an irrevocable option -- conditioned upon either *407 his making the December 1978 option payment or his exercising the option prior to the due date of the second option payment -- good for 2 years, to purchase the 526-acre tract. Bruce made no promise of any kind but had an equal right to buy or not to buy. Anderson was bound by the agreement and the money provided therein as consideration not to sell the land to anyone other than petitioner during the 2-year period, provided that petitioner did not fail to make the December 1978 payment or exercised the right to purchase the 526-acre tract granted pursuant to the terms of the agreement prior to the due date for the second $32,500 payment. We are satisfied that the agreement dated June 14, 1978, and signed and accepted by Anderson on June 30, 1978, granted to petitioner a 2-year lease with an option to purchase, and that it was not a contract of sale. Petitioner's testimony that he did not lease the property nor execute an option to purchase it is contradicted by this record. Petitioner's check in the amount of $37,500 was delivered together with the lease-option agreement. The said agreement specifically provided that "Tendered herewith is my check for $37,500.00, $5,000.00 being *408 the first rental payment and $32,500 the first option payment." Furthermore, the notation on the check indicated that the payment was made for "581 [sic] Acres, A-Bar-A, 6 Months Lease Purchase." Until it is exercised, an option in not, in legal effect, a complete contract. White v. Miller,supra;McWhirter v. Morrow,203 S.W.2d 317 (Tex. Civ. App. 1947). A written option to purchase real property may be orally accepted. San Antonio Joint Stock Land Bank v. Malcher,164 S.W.2d 197 (Tex. Civ. App. 1942). Unless the option contains provisions to the contrary, all that is required of the optionee is that he notify the optionor, prior to the expiration of the option, of his decision to exercise the option. Odum v. Sims,609 S.W.2d 881 (Tex. Civ. App. 1980). The lease-option agreement provided that in order to exercise the option Bruce was required to give Anderson 60-days notice, by certified or registered mail, and Anderson would then have 60 days to deliver a deed conveying fee-simple title to petitioner. Should petitioner decide to exercise the option before the date of the second option payment, he was *409 to deposit $32,500 with the title company selected by Anderson, as earnest money; the option would then become a contract of sale, performable within 60 days after the exercise of the option. Where the option contains provisions stating the manner in which it is to be exercised, the option must be exercised, or as it is frequently stated, the option must be accepted, in accordance with its terms in order that it may ripen into a contract of sale. Zeidman v. Davis,161 Tex. 496, 342 S.W.2d 555 (1961); White v. Miller,supra.To be effectual, acceptance of an option must be unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without reservation, and according to the terms or conditions of the option. Hutcherson v. Cronin,426 S.W.2d 638 (Tex. Civ. App. 1968). Substantial compliance with the terms of the option is insufficient to constitute an acceptance; to be effectual, the acceptance must be identical with the offer or, at least, there must be no substantial variation between them. Hutcherson v. Cronin,supra;White v. Miller,supra.When the option is so exercised, *410 the option contract is converted into an executory contract of sale, entitling the optionee to a conveyance and obligating him to perform the contract on his part. Hutcherson v. Cronin,supra.Although legal title does not pass under a contract of sale until actual delivery of a deed to the property to the purchaser, Lesson v. City of Houston,243 S.W. 485 (Tex. Com. App. 1922), formation of the contract of sale passes equitable title to the purchaser. Lefevere v. Sears,supra;Hamon v. Allen,457 S.W.2d 384 (Tex. Civ. App. 1970). The benefits and burdens of ownership are deemed to pass to the optionee-purchaser when equitable title is transferred. Boykin v. Commissioner,344 F.2d 889 (5th Cir. 1965). Failure to strictly comply with the terms of the option agreement will be excused where the optionor waives his right to notice of the optionee's intention to exercise the option. Cattle Feeders, Inc. v. Jordan,549 S.W.2d 29 (Tex. Civ. App. 1977); Jones v. Gibbs,130 S.W.2d 265 (Tex. Com. App. 1939). It is clear that Anderson retained legal title to the *411 526-acre tract until February 6, 1979, when the warranty deed with vendor's lien was executed by the Andersons. Petitioners contend, however, that: (1) Bruce orally exercised the option; and (2) Anderson waived his right to 60-days notice of petitioner's intention to exercise the option by certified mail before the flood occurred. The burden of proof is on petitioners, Rule 142(a). As we have found, petitioners' initial contention was that they had acquired legal title to the 526-acre tract on July 1, 1978. Bruce denied to respondent's agents and at trial that he had leased the property. According to petitioner, Anderson gave him an option to buy the 526-acre tract and he exercised it verbally; the $37,500 payment was to buy the property. As we have also found, Anderson was interviewed in Lochte's office and in his presence on February 6, 1984. The said interview was transcribed and forms part of the record herein. During the course of the interview, Anderson represented to respondent's agents that the $650,000 promissory note was dated by Lochte on July 1, 1978, and was signed by petitioners on that date in Lochte's office and in the presence of Anderson and his wife. *412 According to Anderson, Bruce took possession of the 526-acre tract on July 1, 1978, "that's when we said, it's your ranch." In explaining why interest on the promissory note was not due until January 1, 1980, even though it accrued from July 1, 1979, Anderson stated that it was a "perk" or incentive that he had given petitioner. Bruce was, stated Anderson, selling Jerky Treats, Inc., one of his businesses, and wanted to postpone the payments on the note until he got the money from the purchaser. Anderson denied having a copy of the lease-option agreement or executing or accepting the said agreement "because he [Bruce] decided that he didn't want to do it that way," and because "the Hart [sic] deal came through quicker than he expected." It was only when he was confronted with his acceptance letter dated June 30, 1978, that Anderson admitted having signed and accepted the lease-option agreement. There was no mention of Bruce's exercising the option after Anderson allegedly declined to exchange the 526-acre tract for Brown's Refrigerated Warehouse. At trial, however, Anderson testified that he executed the lease-option agreement, and that Bruce had provided him with a brochure *413 of the refrigerated warehouse and suggested an exchange of the two properties. Anderson also testified that right after July 4, 1978, he flew to El Paso with his wife and son and toured the facilities and decided not to go ahead with the exchange and notified petitioner accordingly. Petitioner, said Anderson, then decided that he would go ahead with the purchase of the property as per the terms of the lease-option agreement. Anderson said he told petitioner that "the check will serve" and that Lochte was apprised of the fact that the option had been exercised and instructed to distribute the $37,500 that he had deposited in his escrow account to Anderson. Petitioner similarly testified that he had exercised the option around July 9, 1978, and that he was the one who authorized Lochte to distribute the $37,500 to Anderson. Petitioner apprised Belk, by letter dated June 19, 1978, of his intention to acquire the A Bar A Ranch; the 640-acre tract was to be acquired by the PBJ Trust, the 526-acre tract was to be acquired by Bruce personally in a tax-free exchange if possible. The letter described in detail the tax-free exchange that Bruce was planning. Anderson was aware of Bruce's *414 intentions as domonstrated by his letter dated June 30, 1978, in which he accepted the provisions of the lease-option agreement and in which he stated that "if during the period of this agreement you find an opportunity to use my property in a tax-free exchange then I will agree to a cancellation of the Lease and Option to Purchase, providing only that I receive the same amount of money on the same terms which I would receive under your offer if it were fully performed" (emphasis added). We find it hard to believe that after stating the foregoing, Anderson would fly to El Paso five or six days, later, in order to consider exchanging his property for Brown's Refrigerated Warehouse. Bruce and Anderson's testimony -- that the provisions contained in the option agreement concerning the payment of the second option payment, in the amount of $32,500 were waived, that the option was verbally exercised, and that Lochte was then instructed by Bruce to disburse the $37,500 check to Anderson -- is similarly contradicted by Lochte's testimony. Lochte testified that the $37,500 check dated June 26, 1978, was tendered in conjunction with the lease-option agreement, and was a "payment to *415 which Mr. Anderson was entitled." Bruce handed him the check for distribution to Anderson, and after having the check credited to his escrow account, Lochte wrote his own check to Anderson. The delay between the date on which the check was tendered and deposited to Anderson's account was due to Lochte's having to wait for the check to clear before giving Anderson his own check, and not to his waiting for Bruce's authorization to release the money to Anderson. Petitioners have not only failed to prove affirmatively with credible evidence that the option was effectively exercised before the date of the flood, but have also failed to satisfactorily explain why -- if the option was exercised before August 1978 -- another option intended by its own terms to supersede the June 30, 1978 lease-option agreement was even considered by Anderson and Lochte in November 1978. Bruce testified that he asked Belk to prepare the November 1978 option based on the letter dated June 19, 1978, and around that date, but that Belk had procrastinated and did not prepare the option until November 1978. Again, petitioner's testimony was contradicted by Belk who stated that he had prepared the option dated *416 November 30, 1978, as per Bruce's request around November 30, 1978. We also note that the terms of the lease-option agreement dated June 30, 1978, were modified on December 26, 1978 -- with respect to the amount of the down payment, the principal of the promissory note, and the payout terms of the promissory note -- at a meeting between petitioner, Anderson, and Lochte, and that Lochte's handwritten notes were signed by petitioner and Anderson to signify a final agreement.At this time, or shortly before, Bruce transferred to Anderson a check for $77,500. According to petitioner, the purpose of this meeting was to pay Anderson some money and to finish the transaction. He testified that: "I had been screaming for the warranty deed and the deed of trust for some months and Lochte never got around to preparing the darn thing." Petitioner also stated that the closings on the sale of the two tracts were so far apart -- June 30, 1978, and February 6, 1978 -- because Lochte and Jackson "did not get their homework done." However, we are satisfied that, as stated by Lochte, the deed, the promissory notes, and the other documents necessary for the closing of the transaction could not have *417 been prepared before December 26, 1978, because the final terms of the sale were not agreed to until that date. It is noteworthy that the said meeting took place on December 26, 1978, right before the deadline provided in the lease-option agreement for Bruce to make the second option payment in the amount of $32,500 - or otherwise lose the option and the $32,500 already paid by him. It is also noteworthy that the deed conveying fee-simple title (the warranty deed with vendor's lien) was executed on February 6, 1979, within 60 days of December 26, 1978. Petitioners attempt to overcome the import of the unambiguous lease-option agreement by emphasizing that both Bruce and Anderson were ultimately interested in purchasing and selling the 526-acre tract, respectively. However, as stated in the lease-option agreement, even though petitioner was very interested in purchasing the 526-acre trace, he wanted to lease it with an option to purchase. Neither Lochte nor Belk had personal knowledge of when the alleged exercise of the option took place. Lochte was instructed to date all the documents necessary for the transactions as of July 1, 1978. Anderson testified as follows: Q. If *418 you will look in the middle of the paragraph by the single asterisk, it says "effective date of deed is July 1, 1978." A. Uh-huh Q. Did you instruct Mr. Lochte to place this statement on the closing statement? A. That was when the lease option started and that is when the ranch was -- everything started and we said he would date it back to that date. Q. Who said to do that? A. I did, I guess. Q. Why? A. Well, because that is when it started.
Q. What started? A. The transaction. [Emphasis added.] We find that as a matter of fact and law, Bruce did not have legal or equitable title to the 526-acre tract as of August 3, 1978. We are also satisfied that the option was not exercised and that a mutually binding contract of sale was not entered into until December 26, 1978, when Brown manifested his intention to buy the property and made the second option payment, and the parties to the transaction reached a final agreement with regard to the amount of the down payment and the promissory note, and the payment schedule of the promissory note. Even if there was an understanding, prior to the flood, that an agreement would be reached at later date on the *419 terms of a sale, in order that there be a sale for tax purposes there must be no less than a binding agreement that the title will be conveyed by the vendor to the vendee for a stated or determinable consideration payable in a specified manner. Dezendorf v. Commissioner,312 F.2d 95 (5th Cir. 1963), affg. T.C. Memo. 1961-280; 2 Mertens, Law of Federal Income Taxation sec. 12.126 (1985). The fact that petitioners acquired possession before the flood or that Anderson's son, Don, paid them rent is of no consequence in our determination. The owner of a leasehold estate is entitled to possession of the premises during its existence, as he would have been if he had purchased fee-simple to the land. Mallom v. Trans-Texas Airways,227 S.W.2d 344 (Tex. Civ. App. 1950); Galley v. Hedrick,127 S.W.2d 978 (Tex. Civ. App. 1939). This implies the right to charge rent to one that lives on the property. It follows that petitioners are not entitled to the claimed casualty loss deduction inthe amount of $364,900. Issue 3. Interest Expense Deduction
Petitioners claimed no entitlement to an interest deduction with respect *420 to the purchase of the 526-acre tract in their 1978 return. Such claim was made, however, in the amount of $15,000, in the first amendment to the petition filed on March 26, 1985. Petitioner tendered his check dated June 26, 1978, in the amount of $37,500, payable to Darrell Lochte, Escrow, with the lease-option agreement. The said check constituted payment of the first option payment, in the amount of $32,500, and of the $5,000 due as rent for the first 6 months of the lease. On December 22, 1978, Bruce purchased a cashier's check in the amount of $77,500 from the Bank of El Paso, payable to Anderson and delivered it to Anderson. On December 26, 1978, Anderson and Bruce agreed to modify the terms of the lease-option agreement in that: (1) the down payment was reduced from $150,000 to $100,000; (2) the balance of the purchase price ($650,000) was due to be paid with a note hearing interest at a rate of 9.25 percent accruing from July 1, 1979; and (3) the first payment consisting of interest only, from July 1, 1979, was due on January 1, 1980. Petitioners argue that the excess of the sum of the two checks paid to Anderson ($115,000) [9] over the amount of the down payment ($100,000), *421 or 15,000, constitutes interest paid and deductible by them. Section 163(a) allow a deduction, in the case of a cash basis taxpayer, for interest paid within the taxable year on indebtedness. Helvering v. Price,309 U.S. 409 (1940); Christensen v. Commissioner,40 T.C. 563 (1963). Petitioners bear the burden of proving that the claimed amount was paid to Anderson as compensation for the use or forebearance of money. Deputy v. duPont,308 U.S. 488 (1940); Rule 142(a). As we have held, supra the check in the amount of $37,500 constituted payment of rent ($5,000) and the first option payment ($32,500), which was creditable towards the down payment. The second check in the amount of $77,500 constituted payment of the second option payment ($32,500) and of $35,000 to complete the $100,000 down payment. Petitioners have failed to prove that the $10,000 that were not otherwise accounted for were paid for interest. Under the terms of *422 the $650,000 promissory note, interest was to accrue, at an annual rate of 9.25 percent, from July 1, 1979. The first payment on the note in the amount of $30,062.50, constituting interest only, was due on January 1, 1980. This payment was made on January 7, 1980, according to the customer note ledger prepared by Schreiner Bank. No payments of interest or principal were made before this date. No interest payments were due or payable in 1978. Other than petitioner's self-serving testimony, the record is devoid of any evidence that the additional $10,000 paid was paid as interest and not for the purchase of other assets, rent, or paything else. Petitioners are therefore not entitled to the claimed interest expense deduction. Issue 4. Depreciation Deduction and Issue 5. Investment Tax Credit
Petitioners did not claim a depreciation deduction nor an investment tax credit with respect to the 526-acre tract on their return for the taxable year ended December 31, 1978. Such claims were made, however, in the respective amounts of $13,496 and $9,097, in the first amendment to the petition filed on March 26, 1985. In support of their contentions, petitioners argue *423 that they acquired the 526-acre tract and the improvements thereon with the intention of making a profit from the sale of cattle, a pecan-shelling operation, and renting the dwellings on the property. Respondent denies that petitioners had a profit motive to enter into this transaction and argues the applicability of section 183 [10] to deny the claimed deductions. *424 Section 183(a) provides that if any individual's activity constitutes an activity "not engaged in for profit," the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit to the extent that the gross income derived from the activity exceeds the deductions allowed under section 183(b)(1). In order to constitute the carrying on of a trade or business under section 162 or an activity for the production of income under section 212(1) or (2), petitioners must establish that they engaged in the activity with an actual and honest objective of making *425 a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). See also Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Hager v. Commissioner,76 T.C. 759 (1981), and cases cited therein. "Profit," in this context, means economic profit, independent of tax savings. Surloff v. Commissioner,81 T.C. 210 (1983). The issue of whether a taxpayer engaged in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659 (1979); Allen v. Commissioner,72 T.C. 28 (1979). In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate *426 in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.; Boyer v. Commissioner,69 T.C. 521 (1977); Benz v. Commissioner,63 T.C. 375 (1974). It is not intended, however, that only the aforesaid factors be taken into account in making the determination. Sec. 1.183-2(b), Income Tax Regs.
Respondent's determination is presumptively correct. Welch v. Helvering,290 U.S. 111 (1983). The burden of proving the requisite profit objective is on the taxpayer. Rule 142(a). The presumption in section 183(d) is not applicable to the facts herein. Petitioner testified that he considered that there were three profit centers on the ranch: (1) a cattle operation; (2) a pecan-shelling operation; and (3) the possibility of renting some of the houses located on the property during the summer. Bruce was born on a farm *427 in Alabama. He had been involved in the custom brokerage business since 1954, and owned all the issued and outstanding stock of Brown's Refrigerated Warehouse. He also imported Mexican cattle, invested in feedlot operations, and operated a meat-packing plant and a food-processing company. He had, however, no experience in cattle ranching. Other than having stored pecan nuts in his refrigerated warehouse, the record does not disclose any prior experience of petitioner in conducting a pecan-shelling operation. Petitioners did not make any expense-profit projection in order to ascertain what was the minimum number of cattle that had to be grazed on the ranch to obtain a profit. They similarly did not inquire what Anderson's profit or loss experience was. The record is devoid of evidence as to whether petitioners consulted any experts or advisors. During 1978, there was only one permanent employee residing on the ranch. It was not until 1979 that petitioner hired additional permanent employees. Petitioners did not provide usa with copies of their books or records. Petitioners did not attach a Schedule F, Farm Income and Expenses, to their 1978 return, nor did they report any *428 income or expenses from ranching activities. Petitioners did attach a Schedule F to their returns for the years 1979 through 1982, inclusive. They reported losses for all those years as stated in our findings of fact, supra.
Bruce did not purchase any cattle for the ranch until September 1979, when he purchased 35 head of cattle. The maximum number of cattle on the ranch between September 1979 and the year 1982 was approximately 75. The combined carrying capacity of the 640-acre tract belonging to the PBJ tract and the 526-acre tract was 80 animal units. There is no evidence of the measures, if any, that were taken by petitioners to increase the possibility of obtaining a profit from their operation. During 1979 and subsequent years, petitioners built a house on the ranch ($450,000), remodeled the swimming pool ($26,000), built a tennis court ($8,000), remodeled one of the houses on the property in order to convert it into an art studio for Joanne ($3,000), remodeled five other houses on the ranch ($214,000), rebuilt an aircraft hangar ($53,000), and purchased and installed underground fuel tanks ($29,549.50) at a total cost of approximately $783,549.50. The connection *429 between these expenditures and the furtherance of the alleged "profit-centers operations" was not explained at trial, and is not apparent to us. An irrigation system was not installed because petitioners "ran out of money." Electric fences were not installed, brush was not cleared, and hay was not planted until 1979. In sum, petitioners have failed to prove that in 1978 they engaged in any activity on the ranch as a trade or business or for profit. Since no income was reported or derived from the activity in 1978, petitioners' claimed depreciation deduction and investment tax credit must be disallowed, so far as events occurring in that year are concerned. Secs. 38, 46, 48, 162, 167, 183. Petitioners filed a Form 1045, Application for Tentative Refund, with respondent. On the said form, petitioners claimed an unused investment tax credit carryback from 1979 to 1978 in the amount of $4,405. Respondent disallowed the claimed carryback (see our findings of fact, supra) in his notice of deficiency. Petitioners bear the burden of proving that (1) they had an investment tax credit carryback available from 1979; (2) the said carryback was not used in 1976 or 1977; and (3) the *430 claimed amount remained to be carried back to 1978. Sec. 46(b); Rule 142(a). The record herein is devoid of any evidence in support of petitioners' claim. Petitioners requested that we find as a fact that "In 1979 petitioners incurred an operating loss of $187,957.00 on the Cinco "B" Ranch and were entitled to carryback investment credit on purchases to prior years in the amount of $22,084.00." The said proposed finding of fact is, according to petitioners, supported by the Form 1045, and by petitioners' return for the year 1979. Tax returns are not self-proving, Halle v. Commissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949), cert. denied 338 U.S. 949 (1950), nor is a form attached to the return or thereafter filed with respondent. Petitioners have failed to show error in the notice of deficiency. Their claim of entitlement to an investment tax credit carryback, in the amount of $4,405, from 1979 to 1978 must be denied for failure of proof. Issue 6. Fraud
The only remaining issue for decision is whether petitioner Bruce is liable for the addition to tax under section 6653(b) as determined by respondent in *431 his notice of deficiency. [11]
Fraud is an actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Whether fraud exists is a question of fact to be decided upon the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent has the burden of *432 proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213 (1971). Respondent must establish that: (1) there was an underpayment of taxes; and (2) part of the underpayment was due to taxpayer's fraud. Hebrank v. Commissioner,81 T.C. 640 (1983). Fraud is never presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), but may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Stephenson v. Commissioner,79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct must be examined to determine whether the requisite fraudulent intent is present. Stone v. Commissioner,56 T.C. at 223-224. Mere negligence is not proof of fraud; an intent or purpose to evade tax is essential. Estate of Briden v. Commissioner,11 T.C. 1095 (1948), affd. sub nom. Kirk v. Commissioner,179 F.2d 619 (1st Cir. 1950). Finally, respondent may not rely on the presumptive correctness of his statutory notice to assist him in carrying *433 his burden of proof on the fraud issue. The presumption of correctness which attached to respondent's deficiency notice is merely a procedural device, not a substitute for evidence. Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), cert. denied 423 U.S. 1015 (1975). Although respondent can rely on the presumption of correctness which attaches to his statutory notice in support of the deficiency, he may not so rely with respect to issues on which he has the burden of proof, as here. We have made extensive findings of fact about Bruce's lack of forthrightness with respect to the transactions involving the 526-acre tract, and need not repeat them here. While we realize that it is sometimes hard for taxpayers to have a clear recollection of events that happened years ago, we are convinced that petitioner's untruthful statements were not due to natural forgetfulness, but to an actual intent to mislead respondent and this Court into believing that he had never leased, nor intended to lease, the 526-acre tract, and that the back-dated documents transferring him legal title of the property had actually been signed on July 1, 1978, or that the option *434 was exercised soon thereafter, in July 1978. All such deceptive conduct was intended to support Bruce's claim to a casualty loss because of the flood at the ranch at a time when he was not the owner, and he knew it. When confronted with his inconsistent statements, petitioner testified as follows: A. I am sure that I told Schampers [the revenue agent] I signed this thing on July 1, '78, which was wrong. I signed it is February of '79, but I didn't remember at the time whether I had signed it in '78 or '79, but it didn't really matter. The darn documents had not been prepared. There is certainly nothing wrong with backdating the date on a piece of real estate. It is done every day. You don't get realtors and lawyers to get their documents done on time. To this cavalier statement of petitioner we observe: in this wicked world in which we live, it may be true that documents are back-dated every day. Sometimes the reasons may be innocent and the results innocuous; but where a taxpayer deliberately back-dates documents in order to support a substantial deduction claim on his income tax return -- a deduction to which he knows he is not entitled -- there is definitely something *435 wrong about it within the meaning of section 6653(b). Furthermore, we find no innocent explanation for petitioners' claiming a loss deduction of $17,000 with respect to the 640-acre tract, which petitioner stipulated was owned by another taxpayer, the PBJ Trust. Respondent's determination that petitioner is liable for the fraud addition is sustained. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Some of the exhibits describe this tract as having 532 acres. This inconsistency has no effect on our decision herein.↩
3. The option agreement drafted by Belk provided that: (1) Bruce would have an option to buy the 526-acre tract for a period of 1 year commencing on June 30, 1978, in consideration for which petitioner had paid Anderson $32,500; (2) Bruce would have the right to extend the option for a second year upon payment of $32,500; (3) the purchase price of the property, should the option be exercised, would be $750,000 payable as follows: $100,000 at closing, less $22,500 of each of the two option payments, which would be credited to the down payment; (4) $10,000 of each $32,500 payment would be considered as a rent payment; (5) the $650,000 balance of the purchase price would be paid by Bruce's note, bearing interest at an annual rate of 9.25 percent, payable in 20 equal semiannual installments of principal, and interest on the unpaid balance commencing 6 months after the closing; and (6) the agreement would be effective as of June 30, 1978.↩
4. The footnotes marked by asterisks were part of the document. * Effective date of deed is July 1st, 1978, the date when Purchasers gave verbal notice to Sellers that Purchasers exercised earlier option to purchase, with certain changes. ** This sum was paid directly to Sellers as option money and down payment.↩
5. How petitioners arrived at this total claimed credit is not disclosed in this record.↩
6. When the Form 872-T finally got to respondent's office in El Paso thus becomes irrelevant. In any case, it is not disclosed in this record.↩
7. See also Henry v. Commissioner,T.C. Memo. 1983-277; Kennedy v. Commissioner,T.C. Memo. 1973-15; Tillapaugh v. Commissioner,T.C. Memo. 1972-5↩.
8. Petitioners claim of a casualty loss under sec. 165(c)(3), subject to the $100 statutory limitation therein is inconsistent with their claim that the property was acquired in a transaction entered into for profit. Losses with respect to property used in a trade or business or in an income-producing activity are deductible under secs. 165(c)(1) and (c)(2), whether or not they result from a casualty, and are not subject to the $100 limitation in sec. 165(c)(3).↩
9. As follows: ↩
Check dated June 26, 1978 payable
to Darrell Lochte, Escrow
$ 37,500
Check dated December 22, 1978
payable to E. M. Anderson, Jr.
77,500
Total
$115,000
10. Sec. 183 provided, in pertinent part, as follows, during the years in issue: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.↩
11. As effective for the year 1978, sec. 6653(b) read as follows: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩